ARKANSAS–LOUISIANA GAS COMPANY
and U. S. Fidelity & Guaranty
Company, Petitioners,

v.

Virgil BLACKWOOD and the State Industrial Court of the State of Oklahoma,
Respondents.

No. 42956.

Supreme Court of Oklahoma.

July 1, 1969.

H. R. Palmer, Sr., Harry R. Palmer, Jr., Oklahoma City, for petitioners.

J. Clark Russell, Oklahoma City, G. T. Blankenship, Atty. Gen., for respondents.

BLACKBIRD, Justice.

The respondent, Virgil Blackwood, hereinafter referred to as "claimant", is a veteran of military service in the U. S. Armed Forces, during 1954 and 1955. In that period, he was treated for an injury to his left leg. In 1957, he became employed by the petitioner, Arkansas-Louisiana Gas Company, hereinafter referred to, individually, as the "employer", at Ada. In 1958, claimant went to a specialist, who operated on his left leg and assisted him in establishing that his leg injury was connected with his military service and obtaining a decision of the Veterans Administration's adjudication division, for disability compensation purposes, that said injury was 11% disabling.

Claimant's leg improved after the operation, and, after an absence from his job of 13 or 14 weeks in 1958, he returned to work for employer, but, because of his leg condition, was transferred to Seminole County to work under the employer's Seminole manager, Mr. Clifton, in 1961. Claimant's leg condition became worse, and, because, in walking, it threw his "body out of kilter", he began to suffer pain in his back. Claimant went back to the Veterans Administra-

tion for periodic check-ups, and, on his own initiative, began wearing a back brace intermittently.

On November 21, 1967, claimant's employer sent him, driving one of its trucks with a two-way radio in it, from its Seminole office to Maud, Oklahoma, to read its meters there, accompanied by one of its younger employees, Bert Renfrow. After the two men left the truck and started reading the meters on foot, claimant began to complain of pain. Thereafter, when the two men encountered greater distances between meter locations, claimant got back in the truck and drove those distances. Finally, after they had covered many blocks of their meter-reading route, claimant called Mr. Clifton, on the truck's radio, before noon, and told him he was hurting so bad he couldn't continue the work. Clifton told him to "come right on in". Thereupon, Renfrow drove claimant in the truck back to Seminole and let him out on the driveway by employer's office. Claimant then went next door to the office of Dr. B., who had been his doctor since 1961; and Renfrow parked the truck and went into employer's office.

Dr. B. gave claimant "some pain pills", as well as a "knock-out shot", so he could rest, and sent him home. Claimant has not worked since, but employer did not take him off its payroll until he had been paid during a two months "sick leave" which lasted until January 20, 1968.

During this two months' period, Dr. B. treated claimant a few days, and told him he'd like for him to go to the VA (Veterans Administration) Hospital "and let them check me out and see if it (the leg condition) had any effect on my back". Claimant fulfilled the doctor's expressed desire to the extent of being examined at the Veterans Hospital by a Dr. C., on December 21, 1967 (as shown by said doctor's report of that date).

Thereafter, in January (apparently after he learned that his employment had, or was being, terminated) claimant inquired at employer's Seminole office if he "was going to get to go back to work". Clifton then asked him if he could get a release from a doctor. Thereupon, claimant went to Dr. B., who would not give him one, but suggested that he contact the Veterans Administration. Claimant was then examined at the Oklahoma City VA Hospital (this time, in its out-patient clinic) on January 26, 1968. When claimant took the report of this VA examination to Mr. Clifton, Clifton told him he would have to report to a Dr. F., in Oklahoma City, for an examination, before he could go back to work. Dr. F. examined claimant on February 7, 1968, but employer did not re-employ him.

About two weeks later, claimant filed his Form 3 with the State Industrial Court, seeking disability compensation under the Workmen's Compensation Act for an accidental "back injury", represented to have occurred on November 21, 1967. The "Cause of Accident" set forth on said claim form was: "stepping out of truck".

In the answer they filed in said court, employer and its insurance carrier, hereinafter referred to, collectively, as "respondents", denied, in substance, that claimant's disability was the result of any accidental injury in the course of his employment, and alleged that claimant had not given proper notice of such an injury.

After trial before one of said Industrial Court's trial judges, claimant was awarded compensation benefits for a temporary total disability during the period from January 20, 1968, to February 7, 1968. By said order, the court reserved claimant's "permanent partial disability, if any, * * * for further determination", and, after finding that claimant had sustained an "accidental personal injury, arising out of and in the course of his hazardous employment * * * on November 21, 1967, consisting of injury to his back", also found:

"That respondent had actual knowledge of claimant's said accidental injury, and therefore claimant's failure to give written notice of same did not operate to prejudice of respondent, and the failure to give such written notice is excused."

In the present proceeding in this court to review said award, respondents contend that there is " * * * NO COMPETENT OR SUFFICIENT EVIDENCE" to support the trial tribunal's finding that claimant's employer (referred to in said tribunal's above-quoted order as "respondent") had actual knowledge that he sustained *any accidental injury* to his back during the course of his employment by it on November 21, 1967.

Claimant does not deny that, if the employer had no such "actual knowledge", his undisputed failure to give the written notice within 30 days after his alleged injury, as prescribed by our Workmen's Compensation Act (Tit. 85, O.S.1961, sec. 24), had the effect, under said Act, of barring his claim. He does contend, however, that the issue of whether or not his employer had such knowledge, was a question of fact to be determined by the Industrial Court, and that there was competent evidence reasonably tending to support that court's finding on that question, so the award will not be disturbed by this court.

It may be reasonably concluded, from our narrative of the undisputed facts in this case, that the employer, through its manager, Mr. Clifton, received actual notice, or knowledge, directly from the claimant, himself, that he received his claimed disability during the course of his employment in reading meters at Maud on November 21, 1967. But the precise and crucial question then becomes: Is such knowledge, indicating that claimant may have become physically disabled during the performance of his duties on that day, the equivalent (under the Workmen's Compensation law, as applied to the facts of this case) of knowledge that *an accidental injury* (such as he alleged from "stepping out of truck") caused claimant to become so disabled?

Searching claimant's brief for support of an affirmative answer to this question, we find reference to the record of his own testimony as to how he injured his back at Maud on November 21, 1967, also about his afore-mentioned two-way radio conversa-tion from there with manager Clifton in employer's Seminole office, and about his conversation on the job that day with his fellow employee, Bert Renfrow. He also refers to his own affirmative answer to his counsel's question: "Is he (Dr. B.) the doctor you were usually referred to, or do you know?"

Upon examining claimant's entire testimony, we find the following excerpts:
" * * *

"BY THE COURT: Mr. Blackwood, what did you tell Mr. Clifton when you called him after the incident of November 21st, 1967, at Maud?
" * * *

"A I just told him I got down in my back and I didn't think I could make it, that I needed to see a doctor.
" * * *

"BY THE COURT: Did you talk any more about it?

"A Yes, sir, we talked.

"BY THE COURT: Did you tell him how it happened?

"A No, sir, I didn't tell him just how it happened.
" * * *

"BY THE COURT: Did he ever discuss with you how you got down in your back?

"A He never did.
" * * *

"BY THE COURT: * * * Did you tell any supervisor of this respondent company how you got hurt?

"A No, sir.

"BY THE COURT: * * * Did you tell Doctor B(—) what happened to your back?

"A I didn't tell him just how it happened.
" * * *

"RECROSS EXAMINATION
"BY MR. PALMER:

Q As a matter of fact, at the time that you went to Doctor F(—), that is the

first time you gave any doctor a history of having been injured on November 21st, '67, isn't it, \* \* \*?

"A Yes, sir."

Excerpts from the testimony of claimant's fellow worker, Bert Renfrow, are as follows:

"Q How soon after you started (reading meters) over there (at Maud) did Mr. Blackwood start complaining about being bothered or disabled?

"A It was soon after we started when he started complaining.

"Q How long after he started complaining was it before you actually quit?

"A I would say it was about thirty minutes.

"Q Now were you with him at all times?

"A Yes, sir.

"Q Did he make any complaint to you about having injured his back when he stepped off the truck?

"A No, sir.

"Q What was he complaining about?

"A I am not sure, sir, whether it was his leg, back—I am not sure.

" \* \* \*

"Q What did he do?

"A You mean as we progressed along?

"Q Yes, sir.

"A Well, \* \* \* he commented several times about being in pain. Then he called me and told me he didn't think he would read the rest of them.

" \* \* \*

"Q \* \* \*, did you know he did have a bad leg?

"A Yes, sir.

"Q Had he ever advanced any complaint to you with reference to his back?

"A No, sir.

" \* \* \*

"BY THE COURT:

" \* \* \*

"Did Mr. Blackwood ever tell you that he injured his back when he stepped from a truck in Maud?

"A No, sir.

"BY THE COURT: Did he ever tell you he hurt his back?

"A No, sir.

" \* \* \*.

As indicated by the above quotations from the record, there is no evidence in this case that the respondents, or either of them, ever received notice, until long after expiration of the 30-day period prescribed by Section 24, supra, that claimant received an accidental injury from stepping out of his employer's truck at Maud on November 21, 1967. While there is some variety of opinion on such matters in other jurisdictions (See 58 Am.Jur., "Workmen's Compensation", sec. 384, and the annotations at 92 A.L.R. 505, 512–517, both incl., 107 A.L.R. 815, 822–826, both incl., 145 A.L.R. 1263, 1289–1300, both incl.) this court has adhered to the following rule:

"Where claimant fails to give to the Commission and to the employer notice in writing of an injury for which compensation is payable under the Workmen's Compensation Law within 30 days after injury, and seeks to excuse such failure upon the ground that the employer had actual notice of the injury, the claimant must prove that the employer had actual notice of the time, place, nature and *cause of the injury*, and if the employer be a corporation, then such actual notice must be to an agent or officer thereof upon whom legal process may be served, or any agent in charge of the business in the place where the injury occurred, or a superintendent or foreman in the place where the injury occurs, and required, in the latter instance, under the rules of the company to report accidental injuries to the employer." (Emphasis added) Transwestern Oil Co. v. Partain, 188 Okl. 97, 106 P.2d 263.

After quoting the above rule in Kansas City Distributing Corporation v. McCroskey, 175 Okl. 307, 52 P.2d 765, we said:

"As this court has repeatedly held mere notice of disability of an employee without any information which would impart notice to the employer that it was the result of an accidental injury or any claim for compensation on account thereof is insufficient to apprise such employer in regard thereto."

■ In view of the record in this case, we must hold, as we did in the last above-quoted case, that there being no evidence to support the finding of the State Industrial Court as to actual notice (the declared excuse for claimant's failure to give the written notice prescribed by Section 24, supra), his " * * * claim for compensation was barred by the statute and the State Industrial Commission (now Court) had no jurisdiction to consider the same or to make an award thereon."

The award herein is therefore vacated.

IRWIN, C. J., BERRY, V. C. J., and DAVISON, JACKSON and McINERNEY, JJ., concur.

WILLIAMS, HODGES and LAVENDER, JJ., dissent.

LAVENDER, Justice (dissenting).

In my view the decisive question is not whether the employer gave "actual" or verbal notice to his employer in lieu of the written notice required by 85 O.S.1961, § 24 and whether this verbal notice sufficiently advised the employer of the facts of the claimant's injury, but whether the finding by the State Industrial Court that the employer was not prejudiced because the claimant failed to give the written statutory notice to his employer was supported by any competent evidence. If it was, then, as I see it, our duty is to affirm that decision, regardless of the fact that under the evidence we might have reached a different conclusion.

From reviewing the record I find that the claimant told Dr. F. (the company doctor to whom he was sent for a physical examination before the company would allow him to return to work) about the November 21 job-connected back injury and the doctor in turn advised the company by a letter dated the following February 7. The claimant filed his claim with the Industrial Court on February 22 and the matter was heard on March 4. The order under review was entered March 19, 1968. The employer's answer denied the back injury was chargeable against it contending that any disability to the back was caused, or originated with the military service leg injury claimant suffered several years before going to work for the employer. This was largely a question for the medical experts. This question of fact was resolved by the Industrial Court in favor of the claimant.

There is nothing to indicate that the respondent was prejudiced by the failure of the claimant to give the notice required by the above statute. The Industrial Court, I think, was justified in concluding that the employer was not prejudiced. The employer was not prevented or—so far as this record reveals—in any way hindered from making as thorough an investigation into the circumstances as it could have done if it had received the formal written notice the day following its occurrence. Certainly the employer was not prevented from furnishing competent medical attention to the claimant and from thereby minimizing its possible loss. As noted, the employer denied that it was liable for the injury even if the notice question was out of it.

My conclusions are based on the following cases: Skelly Oil Co. v. Grimm et al. (1945), 196 Okl. 122, 163 P.2d 234; Massachusetts Bonding & Ins. Co., et al. v. Welch et al. (1945), 195 Okl. 636, 159 P.2d 1017; Jones et al. v. Oliver et al., 204 Okl. 164, 228 P.2d 173; and Gulf Oil Corp. v. Kincannon, et al. (1950), 203 Okl. 95, 218 P.2d 625, wherein this court said:

"The purpose of the statute (now 85 O.S.1961 § 24) * * * is to furnish prompt information to the employer in order that he may make a proper and

timely investigation of the accident in order to determine the cause, nature and extent of the injury and in order that he might furnish prompt medical treatment to prevent or minimize resulting disability."

For the above reasons I respectfully dissent.

I am authorized to state that Justice HODGES concurs with the views hereinabove expressed.